IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| NAOMI OSORIO-WALIZER, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE NO.: |
| | ) | |
| v. | ) | |
| | ) | |
| VENTRON MANAGEMENT, LLC | ) | JURY TRIAL DEMANDED |
| d/b/a BARRINGTON HILLS | ) | |
| APARTMENTS, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff, Naomi Osorio-Walizer, by and though the undersigned counsel of record, and files her Complaint for Damages against the above-named Defendant, Ventron Management, LLC d/b/a Barrington Hills Apartments (hereinafter "Defendant" or "Ventron"), showing the Court as follows:

## JURISDICTION AND VENUE

1.  Plaintiff Naomi Osorio-Walizer ("Plaintiff") is currently a temporary resident of the State of Florida.

2.  Defendant is a foreign corporation with its corporate headquarters at 3700 Airport Road, Suite 404, Boca Raton, Florida 33431.  The Registered Agent

1

for Defendant is Mark Stewart, 2200 Sullivan Road, College Park, Georgia 30337 (Fulton County).

3.   Defendant owns and operates residential real estate properties, including Barrington Hills Apartments in Norcross, Georgia.

4.   This Court has subject matter jurisdiction over the matters at issue.

5.   This Court has personal jurisdiction over Defendant.

6.   Venue for this action is proper in this Court.

7.   Plaintiff has complied with all prerequisites to the filing of this action, having filed a Charge of Discrimination with the Equal Employment Opportunity Commission on January 28, 2011 and an Amended Charge on February 1, 2011 and having received a "Notice of Right to Sue" on April 12, 2011.  This action is filed within ninety (90) days of Plaintiff receiving the "Notice of Right to Sue," which is dated April 11, 2011.

<u>BACKGROUND FACTS</u>

8.   Plaintiff was an employee of Defendant from July 28, 2010 to November 1, 2010.

9.   Plaintiff worked for Defendant as a Leasing Agent.

10.  As a Leasing Agent, Plaintiff was supervised by Sharon Collette.

11.  During Plaintiff's employment with Defendant she was pregnant.

12.    During Plaintiff's employment with Defendant she had some health problems and complications relating directly to her pregnancy. This included extreme nausea, vomiting, extreme gagging reflex, dizziness, diarrhea, significant back pain, migraine headaches, difficulty sleeping, and loss of consciousness.

13.    Plaintiff was prescribed medications for the extreme nausea, vomiting and migraine headaches.

14.    Other than health problems and complications relating directly to her pregnancy, Plaintiff did not have other health problems during her employment with Defendant.

15.    Plaintiff discussed some of the health problems and complications she was having with her pregnancy with Ms. Collette.

16.    Ms. Collette was aware of the pregnancy-related health problems and complications Plaintiff was having.

17.    Plaintiff needed and received medical treatment for the health problems/complications she had with her pregnancy.

18.    During Plaintiff's employment with Defendant, Ms. Collette was designated under Defendant's policies and procedures as someone to whom Plaintiff could report incidents of offensive and sexually harassing conduct by co-workers.

19.  During Plaintiff's employment with Defendant, Ms. Collette was generally responsible for, among other things, addressing and resolving employee reports of offensive and sexually harassing conduct by co-workers.

20.  During Plaintiff's employment with Defendant, if Ms. Collette received a report from an employee that he/she was being subjected to unwanted, inappropriate or offensive conduct of a sexual nature by a co-worker, Ms. Collette was required to report the matter to other personnel at Defendant in a management or human resources role.

21.  During Plaintiff's employment with Defendant, she worked with a woman named Candice Calil in the leasing office.

22.  During Plaintiff's employment with Defendant, Ms. Calil made graphic, lewd sexual statements to Plaintiff or to others in Plaintiff's presence on various occasions.

23.  On other occasions in the leasing office, Ms. Calil simulated sexual activities with other male employees.

24.  Ms. Calil would suck on a candy in the office to simulate giving oral sex.

25.  Ms. Calil commented on her sex life at home with her husband.

26.  Ms. Calil asked the Maintenance and Courtesy Officer to "bend me over on the desk and give it to me," then she bent over Plaintiff's desk and said they

could use it.

27.  Ms. Calil sent sexual and offensive text messages, including one text message indicating that the owner of the phone sometimes gets it in the ass.

28.  On one occasion a male resident tried to hit on Plaintiff in the leasing office. After the resident left Ms. Calil talked about how Plaintiff should "use" him and "fuck" him, and if Plaintiff wanted it wouldn't be anyone's business but theirs.

29.  On one occasion, Ms. Calil commented to maintenance personnel in front of Plaintiff and a resident, "Damn, from a distance I thought you were another nigga' that I could screw.  Damn, if I knew it was you I wouldn't have looked so hard."

30.  Ms. Calil would make physically suggestive and provocative gestures to male maintenance personnel like, for example, pushing her breasts up and then licking her lips in a come-hither manner.

31.  Ms. Calil made sexually suggestive and provocative comments to male maintenance personnel, for example, stating that she "liked it hard" as she squeezed a male employee's arm.

32.  After a while, picking up on Ms. Calil's cues, male maintenance personnel began making sexually suggestive, inappropriate and offensive comments in

and around the leasing office.

33.     Pursuant to Defendant's harassment policy, Plaintiff reported to Ms. Collette
        that Ms. Calil had made inappropriate and offensive comments in the
        workplace, that she considered them to be inappropriate and offensive, and
        she (Plaintiff) didn't want to have listen to that kind of language in the
        workplace.

34.     Plaintiff made it clear to Ms. Collette that she wanted and expected the
        company to take care of the situation and make Ms. Calil stop with the
        inappropriate and offensive sexual comments.

35.     Ms. Collette was unresponsive to Plaintiff's requests.

36.     Ms. Calil continued to make comments of a sexual nature after Plaintiff had
        reported the conduct to Ms. Collette.

37.     Ms. Collette did not contact anyone in management or human resources after
        receiving Plaintiff's complaints about Ms. Calil.

38.     On October 30, 2010 Plaintiff sent an e-mail to Ms. Collette once again
        reiterating her complaints about Ms. Calil's continued inappropriate and
        offensive statements in the office.

39.     Ms. Collette did not receive or see Plaintiff's e-mail on October 30 because it
        did not arrive in Ms. Collette's electronic "Inbox."

40.   On or about Monday, November 1, 2010 Plaintiff was called into a meeting to discuss, among other things, a work situation involving some communication between Plaintiff and Assistant Property Manager Abel Cantu about the use of a golf cart on the property.

41.   Ms. Collette asked Mr. Cantu to attend the meeting.

42.   Prior to the meeting, Ms. Collette did not state or suggest to Mr. Cantu that this was going to be a termination meeting.

43.   Prior to the meeting, Ms. Collette did not state or suggest to Mr. Cantu that she planned to terminate Plaintiff's employment.

44.   Prior to the meeting, Ms. Collette did not state or suggest to Mr. Cantu that she was considering terminating Plaintiff's employment.

45.   Prior to the meeting, Ms. Collette did not state or suggest to Mr. Cantu that terminating Plaintiff's employment was even an option for consideration.

46.   Present in the meeting were Ms. Collette, Mr. Cantu and Plaintiff. No one else was present in the meeting.

47.   During the meeting, Ms. Collette suggested that Plaintiff had communicated inappropriately with Mr. Cantu regarding the golf cart and/or the golf cart key.

48.   Plaintiff tried to explain to Ms. Collette that she did not have the key, nor did

she know where it was, to give to Mr. Cantu, and that's what she had attempted to tell him.

49.     Plaintiff further explained that if she spoke to Mr. Cantu in a way or in a tone that someone else considered inappropriate, disrespectful or insubordinate, that was not her intent.

50.     During the meeting, Ms. Collette handed Plaintiff a write-up.

51.     The write-up concerned, in general, Plaintiff's professionalism and interaction with other employees.

52.     In response to the write-up, Plaintiff stated that she didn't believe that those were the actual reasons that she was being written up; rather, she believed she was being written up because she had complained on previous occasions about Candace Calil's inappropriate and offensive comments in the office, including the e-mail she'd attempted to send to Ms. Collette on Saturday, October 30.

53.     Ms. Collette told Plaintiff she hadn't received her e-mail.

54.     Plaintiff showed Ms. Collette the e-mail, and Ms. Collette printed out a copy.

55.     Ms. Collette read the bulk of Plaintiff's e-mail to Mr. Cantu.

56.     Plaintiff's e-mail specifically referenced that Ms. Calil had been making graphic, inappropriate and offensive sexual comments in the office and

Plaintiff wanted it to be addressed.

57.   Plaintiff told Ms. Collette that she was frustrated that Ms. Collette had not done anything to address the situation.

58.   Plaintiff further stated that if Ms. Collette, management or Human Resources was unwilling or unable to address the problem then she'd have nowhere else to go but to the EEOC to have the situation dealt with properly.

59.   This was not the first time Plaintiff had stated to Ms. Collette that if she, management or Human Resources was unwilling or unable to address the problem she'd have nowhere else to go but to the EEOC to have the situation dealt with properly.

60.   At that point, after reading Plaintiff's e-mail, Ms. Collette told Plaintiff that she didn't think that she (Plaintiff) was a good fit for the property.

61.   Ms. Collette told Plaintiff that based on the problems Plaintiff had had with her health (pregnancy) and other employees she wasn't a good fit.

62.   Ms. Collette also told Plaintiff that she couldn't have her threatening to go to the EEOC about the issue with Ms. Calil.

63.   Ms. Collette then informed Plaintiff that she was being terminated.

64.   Defendant terminated Plaintiff's employment effective November 1, 2010.

65.   Attached to this Complaint is the affidavit of former Assistant Manager Abel

Cantu, which documents the discussions held and the statements made during the November 1, 2010 meeting.

66. Ms. Calil's conduct and statements created a hostile work environment for Plaintiff.

67. Defendant was in a position to exercise reasonable and ordinary care and diligence to prevent Plaintiff from being subjected to inappropriate and offensive conduct by Ms. Calil.

68. During Plaintiff's employment with Defendant, Defendant failed to take appropriate measures to curtail various incidents of inappropriate, offensive and sexually harassing conduct by Ms. Calil.

<u>CAUSES OF ACTION</u>

<u>COUNT I</u>

<u>HOSTILE WORK ENVIRONMENT</u>
<u>SEXUAL HARASSMENT UNDER TITLE VII</u>

69. Paragraphs 1 through 68 are incorporated herein by this specific reference.

70. The hostile work environment sexual harassment to which Plaintiff was subjected was severe and pervasive to the extent that it changed the terms and conditions of Plaintiff's employment.

71. The sexual harassment, coupled with Defendant's failure and/or refusal to take any remedial action in response to Plaintiff's repeated complaints and

reports of same to Ms. Collette, created a hostile working environment based on Plaintiff's sex, in violation of 42 U.S.C. § 2000 et seq., thereby entitling Plaintiff to all appropriate relief provided under the statute.

COUNT II

RETALIATION UNDER TITLE VII

72. Paragraphs 1 through 71 are hereby incorporated by this reference.

73. Plaintiff engaged in activity that is protected under Title VII from acts of retaliation.

74. Defendant terminated Plaintiff's employment, in whole or in part, in retaliation for complaining of hostile work environment sexual harassment.

75. Defendant terminated Plaintiff's employment, in whole or in part, in retaliation for her engaging in protected activity in violation of Title VII.

76. As a consequence of Defendant's deliberate and willful conduct, Plaintiff has suffered damages, thus entitling her to all appropriate relief provided under the statute.

77. As a consequence of Defendant's deliberate and willful conduct, Plaintiff has lost wages and other benefits of employment.

78. As a consequence of Defendant's deliberate and willful conduct, Plaintiff has suffered mental and emotional distress, inconvenience, humiliation,

11

degradation, embarrassment, anxiety, stress, dismay, perturbation, mental

disquiet, anger and diminished enjoyment of life.

## COUNT III

### GENDER/PREGNANCY DISCRIMINATION UNDER
### TITLE VII & PREGNANCY DISCRIMINATION ACT (PDA)

79.   Paragraphs 1 through 78 are hereby incorporated by this reference.

80.   Other than health problems and complications relating directly to her

pregnancy, Plaintiff did not have other health problems during her

employment with Defendant.

81.   Plaintiff discussed some of the health problems and complications she was

having with her pregnancy with Ms. Collette prior to her termination.

82.   Ms. Collette was aware of the pregnancy-related health problems and

complications Plaintiff was having prior to her termination.

83.   Plaintiff needed and received medical treatment, including medications,  for

the health problems and complications she had with her pregnancy.

84.   During the meeting in which Plaintiff was terminated, Ms. Collette told

Plaintiff that based on the problems she had had with her health (pregnancy)

and other employees she wasn't a good fit for the company.

85.   Defendant terminated Plaintiff's employment, in whole or in part, because

Plaintiff was pregnant and she was having certain health problems and

complications which were directly related to her pregnancy.

86.   As a consequence of Defendant's deliberate and willful conduct, Plaintiff has suffered damages, thus entitling her to all appropriate relief provided under the statute.

87.   As a consequence of Defendant's deliberate and willful conduct, Plaintiff has lost wages and other benefits of employment.

88.   As a consequence of Defendant's deliberate and willful conduct, Plaintiff has suffered mental and emotional distress, inconvenience, humiliation, degradation, embarrassment, anxiety, stress, dismay, perturbation, mental disquiet, anger and diminished enjoyment of life.

<u>COUNT IV</u>

<u>NEGLIGENT SUPERVISION</u>

89.   Paragraphs 1 through 88 are incorporated herein by this specific reference.

90.   At all times relevant to this action Ms. Calil was working for Defendant under the direct supervision of Ms. Collette.

91.   During Plaintiff's employment with Defendant, Defendant was in a position to exercise reasonable and ordinary care and diligence to prevent Plaintiff from being subjected to tortious and harmful conduct by Ms. Calil and other of Defendant's personnel and failed to do so.

13

92.   Defendant was grossly negligent in failing to properly monitor and supervise Ms. Calil once Ms. Collette received complaints from Plaintiff of her inappropriate and offensive conduct. Defendant's gross negligence directly and proximately resulted in injury to Plaintiff.

93.   Defendant acted with such an entire want of care as to raise the presumption of conscious or reckless indifference to Plaintiff's protected rights, and/or that Defendant acted with actual or imputed knowledge that the inevitable or probable consequences of its actions or omissions would result in injury to Plaintiff and a violation of her rights under state and federal law.

## COUNT V

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

94.   Paragraphs 1 through 93 are incorporated herein by this specific reference.

95.   At all times relevant to this action Ms. Calil was working for Defendant under the direct supervision of Ms. Collette.

96.   During Plaintiff's employment with Defendant, Defendant was in a position to exercise reasonable and ordinary care and diligence to prevent Plaintiff from being subjected to tortious and harmful conduct by Ms. Calil and other of Defendant's personnel and failed to do so.

97.   Ms. Calil's inappropriate and offensive conduct, and Defendant's

14

failure/refusal to take appropriate remedial action to curtail and prevent same, was inexcusable, unreasonable, extreme and outrageous.

98.   Defendant terminated Plaintiff's employment, in whole or in part, in retaliation for complaining of hostile work environment sexual harassment while she was pregnant.

99.   Defendant terminated Plaintiff's employment, in whole or in part, in retaliation for her engaging in protected activity in violation of Title VII while she was pregnant.

100.   Defendant terminated Plaintiff's employment, in whole or in part, because Plaintiff was pregnant and she was having certain health problems and complications which were directly related to her pregnancy.

101.   Ms. Collette knew that Plaintiff was going to be a single mother when she terminated Plaintiff's employment.

102.   Ms. Collette knew that Plaintiff's job with Defendant was the main means of financial support she had for herself and her unborn child at the time she terminated Plaintiff's employment.

103.   Ms. Collette knew at the time she terminated Plaintiff's employment that, as Defendant was providing housing in an apartment on the property as part of Plaintiff's compensation as a Leasing Agent, Plaintiff's termination would

leave her without housing and the means to pay for housing for herself and her unborn child.

104.   Defendant's actions were extreme and outrageous.

105.   As a consequence of Defendant's deliberate, willful and unconscionable conduct, Plaintiff has suffered damages, thus entitling her to all appropriate relief provided under the statute.

106.   As a consequence of Defendant's deliberate, willful and unconscionable conduct, Plaintiff has lost wages and other benefits of employment.

107.   As a consequence of Defendant's deliberate, willful and unconscionable conduct, Plaintiff has suffered severe emotional distress, including humiliation, degradation, embarrassment, anxiety, stress, dismay, perturbation, mental disquiet, anger and diminished enjoyment of life.

108.   Plaintiff is entitled to an award of damages for intentional infliction of emotional distress including, but not limited to, pain and suffering, mental distress and anguish, humiliation, degradation, embarrassment, anxiety, stress, dismay, perturbation, mental disquiet, anger, diminished enjoyment of life  and other damages incurred as a result of Defendant's tortious actions and omissions.

## COUNT VI

## PUNITIVE DAMAGES

109.   Paragraphs 1 through 108 are incorporated herein by this specific reference.

110.   At all times relevant to this action Ms. Calil was working for Defendant under the direct supervision of Ms. Collette and other management personnel.

111.   During Plaintiff's employment with Defendant, Defendant was in a position to exercise reasonable and ordinary care and diligence to prevent Plaintiff from being subjected to tortious and harmful conduct by Ms. Calil and other of Defendant's personnel and failed to do so.

112.   The hostile work environment sexual harassment to which Plaintiff was subjected, and Defendant's failure/refusal to take appropriate remedial action to curtail and prevent same, showed willful misconduct, malice, fraud, wantonness, oppression, or such an entire want of care which raises the presumption of conscious indifference to the consequences for Plaintiff justifying an award of punitive damages.

113.   Under these circumstances, an award of punitive damages is authorized pursuant to Title VII, PDA and/or O.C.G.A. § 51-12-5.1.

## COUNT VII

## EXPENSES OF LITIGATION

114.   Paragraphs 1 through 113 are incorporated herein by this specific reference.

115.   Under the facts and circumstances of this case, Plaintiff is entitled to

recovery of her expenses of litigation, including reasonable attorney's fees,

pursuant to 42 U.S.C. § 1988 and/or O.C.G.A. § 13-6-11.


WHEREFORE, Plaintiff demands:

   1.   That this Complaint be filed and served as provided by law;

   2.   That Plaintiff be awarded back pay and front pay;

   3.   That Plaintiff be awarded compensatory damages for the

injuries, indignities and affront she sustained and experienced as

a direct and proximate result of the sexual harassment,

retaliation and other tortious conduct to which she was subjected

during her employment with Defendant, including her pain and

suffering, mental distress and anguish, humiliation, degradation,

embarrassment, anxiety, stress, dismay, perturbation, mental

disquiet, anger, diminished enjoyment of life and the violation

of her rights under state and federal law, in an amount to be

determined by the enlightened conscience of an impartial jury;

4.  That Plaintiff be awarded a judgment against Defendant for punitive damages under Title VII, PDA and/or in accordance with O.C.G.A. § 51-12-5.1 in an amount to be determined at trial;

5.  That attorney's fees and all costs of this action be cast upon Defendant pursuant to 42 U.S.C. § 1988 and/or O.C.G.A. § 13-6-11;

6.  That Plaintiff receive such other and further relief as the Court deems just and proper; and

7.  That trial by jury be allowed as to all issues alleged in this Complaint.

Respectfully submitted this 11th day of May, 2011.


_A. Bradley Dozier, Jr._
A. Bradley Dozier, Jr.
Georgia Bar No. 228701


DOZIER LAW GROUP, LLC
889 Lenox Court, N.E.
Atlanta, Georgia 30324
Telephone    (404) 949-5600
Facsimile    (404) 478-8880